MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 80–463–N.

United States District Court, D. Massachusetts.

Dec. 17, 1982.

Leonard Rose, Falmouth, Mass., for plaintiff.

Asst. U.S. Atty. Marianne Bowler, Chestnut Hill, Mass., for defendant.

## MEMORANDUM AND ORDER

DAVID S. NELSON, District Judge.

This cause of action has been filed by the plaintiff, Massachusetts Lobstermen's Association [hereinafter MLA], against the United States of America. The complaint alleges "tortious acts" by the United States Coast Guard causing the sinking of the lobsterboat "Jamie Leigh." The MLA is a nonprofit corporation with its principal place of business in Marshfield, Massachusetts. The MLA is the assignee and subrogee of rights possessed by King & Sons Fishing Co., the legal owners of the vessel.

Thus, the MLA is the real party in interest and has standing to sue.

Jurisdiction is predicated upon the Federal Torts Claim Act, 28 U.S.C. § 2671, *et seq.* The alleged unauthorized sinking of the "Jamie Leigh" occurred on October 7, 1978. On February 26, 1979, the plaintiff made a written claim against the United States Coast Guard in the amount of $12,000. The claim for damages was denied on November 14, 1979. On November 20, 1979, the plaintiff requested a reconsideration of the negative decision on the claim. On January 28, 1980, the United States Coast Guard denied the request for reconsideration. Having exhausted all administrative remedies, the case is properly before the court for final adjudication.

## I  *Findings of Fact*

On October 7, 1978, the Lobsterboat "Jamie Leigh" was at sea approximately eight miles southeast of the breakwater at Gloucester, Massachusetts. As the testimony of Mr. Donald King (the ship's master) reveals, the ship began to take on water at some time before 4:00 p.m. A distress call was radioed to the United States Coast Guard by Mr. King. Ultimately, the vessel rolled over to its starboard side with Mr. King on it. Mr. King, wearing a lifejacket, escaped and remained in the water for about 15 minutes prior to being rescued by the Coast Guard. At the time of the Coast Guard vessel's arrival, winds were blowing southeasterly at 15 miles per hour, visibility was 10 miles, the seas had a 3 foot swell with a 1 foot chip, and the temperature was 58 degrees.

The crewmen of the Coast Guard vessel brought Mr. King aboard; they took him below the deck and wrapped him in blankets. Mr. King was wet, angry, and cold; however, he was not suffering from shock or hypothermia. The Coast Guard crewmen then surveyed the sinking vessel. The vessel was found to be in a vertical position with one or two feet of the bow exposed. Mr. Ralph Stevens, the coxswain, requested advice from the United States Coast Guard

Rescue Coordination Center in Boston. Chief Petty Officer W.L. Benson instructed the crewmen to sink the vessel if the operator/master gave them permission.

The crewmen inquired of the master/operator, Mr. Donald King, whether the ship should be marked or sunk. Mr. King, who represented himself as the owner of the vessel, granted the crew permission to sink the "Jamie Leigh." The coxswain ordered his crewmen to chip a hole in the bow of the vessel. This was done and the vessel sank. Contrary to the contentions put forth by the plaintiff, the evidence adduced at trial proves that unequivocal permission to sink the "Jamie Leigh" was given to the Coast Guard. All of the crewmen testified that Mr. King instructed them to sink the ship. Even Mr. King conceded that he told the crewmen to "do whatever you think is best." Indubitably, the preceding instruction implies three options: mark the vessel, salvage the vessel or sink the vessel. The first and second alternatives were not practical under the circumstances because only one to two feet of the bow were above the water, and a line could not be secured to the vessel. Nor was it feasible or safe to send a man into the water in an attempt to attach a line to the vessel. The sinking vessel may have submerged pulling the diver down with it.

Furthermore, Mr. S. James Simpson, Jr., a salvage expert, expressed serious doubts as to whether the ship could have been towed given its condition. He also testified that the requisite salvage equipment was not always available in Gloucester. The foregoing factual determinations are supported by the evidence.

## II  *Conclusions of Law*

■ All credible evidence leads me to the ineluctable conclusion that Mr. Donald King, the master/operator of the "Jamie Leigh," gave explicit instructions to the Coast Guard crewmen granting permission to sink the ship. The testimony of all crewmen attests this fact. Therefore, it logically follows that no claim for tortious conduct can be sustained against the United States.

The plaintiff has failed to carry its burden of proving each element of the cause of action by a preponderance of evidence. The plaintiff has not shown that the defendant engaged in negligent conduct, nor has the plaintiff proved any other acceptable theory of legal liability. Negligence is the doing of something, which a reasonably prudent person, in the ordinary course of human events, would not do, or the failure to do something which a reasonable person of ordinary prudence would do. Hence, it is the failure to use due care in the management of one's person, property, or agency under one's control. Too, the negligent act must be the legal or proximate cause of the delictual result or injury. Prosser, The Law of Torts (2nd) 142 (1971); *see also United States v. DeVane,* 306 F.2d 182, 186 (5th Cir.1962). *Frank v. United States,* 250 F.2d 178 (3rd Cir.1957). The plaintiff has not proved even the slightest degree of negligence on the part of the defendant.

■ The plaintiff has asked the court to accept the wholly fatuous argument that a failure to obtain a written release from Mr. Donald King prior to the sinking creates tort liability. This argument is spun out of the gossamer threads of speculation and conjecture. The plaintiff never presented the court with legal authority supporting the preceding proposition; and none exists. The failure to obtain a written release before sinking the vessel violated no legal duty owed by the defendant to the plaintiff. It may well have violated an established policy of the Coast Guard for which the offending crewmen may be disciplined. It is, however, juridically irrelevant to the disposition of this dispute, since no legal obligation flowing from the defendant to the plaintiff has been breached.

■ Further, plaintiff argues that the true owner of the vessel is Mr. Al King, the father of Donald King. The plaintiff contends that notice should have been given to Mr. Al King before sinking the vessel. This assertion has no legal merit. The master of a vessel is the agent and representative of the owner. Norris, 1 The Law of Seamen c. 25 § 522 (1970). He has a fiduciary rela-

tionship with the owner. *Hansen v. Barnard,* 270 F. 163 (2d Cir.N.Y.1920). He is the representative of the owner; thus, his actions are those of the owner. *Farmer v. The O/S Fluffy D,* 220 F.Supp. 917 (D.C. Tex.1963).

Finally, the Coast Guard has the authority to destroy or tow into port sunken or floating dangers to navigation without regard to their ownership. 14 U.S.C. § 88(a)(4). The emergency conditions extant at the time of rescue necessitated the Coast Guard's action. The vessel "Jamie Leigh" posed a threat to navigation; it obstructed the waterway. The Coast Guard's actions were performed in good faith and comported with the requirements of law.

Predicated upon the findings of fact and legal analysis in the opinion, I find for the defendant, the United States of America. Judgment shall be entered in accordance with this opinion. Be it SO ORDERED.