Leonard J. PIETRAFESA, et al.

v.

The **BOARD OF GOVERNORS FOR HIGHER EDUCATION, et al.**

Civ. A. No. 91–0083 P.

United States District Court,
D. Rhode Island.

March 2, 1994.

---

John Alan Jones, William Poor, for plaintiffs.

Louis J. Saccoccio, for Board of Governors for Higher Educ.

Mark Dolan, John O'Donnell, for Peterson Builders, Inc.

Robert Collins, for Brookhaven Nat. Laboratory.

Gordon P. Cleary, for R.A. Stearn, Inc.

Christopher H. Little, for Pierre Biscaye and Columbia University.

### ORDER

PETTINE, Senior District Judge.

The Report and Recommendation of United States Magistrate Judge Timothy M. Boudewyns filed on January 24, 1994 in the above-captioned matter is hereby accepted pursuant to 28 U.S.C. § 636(b)(1) as it pertains to defendants Pierre Biscaye and Columbia University's motion for summary judgment.

SO ORDERED.

### ORDER

Defendant/Cross–Defendant, Peterson Builders, Inc. ("Peterson Builders"), pursuant to Fed.R.Civ.P. 56, filed a Motion for Summary Judgment regarding the cross-claim of the defendant/cross claimant, The Board of Governors for Higher Education ("Board").

Peterson Builders, as an original defendant, had filed a motion for summary judgment as to all claims brought against it by the plaintiffs. This motion was granted. However, the Magistrate Judge withheld consideration of a summary judgment on the Board's cross-claim against Peterson Builders until Peterson Builders filed this summary judgment motion.

■ A reading of the Magistrate Judge's Report and Recommendation and the summary judgment motions clearly establishes that there is no evidence whatsoever of any liability that Peterson Builders was at fault.

Peterson Builders' motion for summary judgment is hereby granted against the cross-claim of the Board.

SO ORDERED.

### REPORT AND RECOMMENDATION

BOUDEWYNS, United States Magistrate Judge.

Peterson Builders ("Peterson"), as an original defendant, has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure ("FRCP") 56 as to all claims brought against it by plaintiffs Leonard Pietrafesa ("Pietrafesa") and Marilyn Tully Pietrafesa. No objection has been filed by Pietrafesa and the motion is otherwise meritorious;[1] however, an objection was filed by the Board of Governors for Higher Education (the "Board")[2] "to the extent that the granting of Peterson's motion may affect the Board's interest" in its cross-claims against Peterson.

Both Peterson and the Board have represented to this Court (without citation, legal argument or briefing) that case law from other circuits would require a *dismissal of Peterson from the suit* upon a grant of summary judgment on the original claims against Peterson. For this reason, and because both Peterson and the Board have demonstrated

---

1. At the hearing on this matter, Counsel represented to the Court that Pietrafesa and Peterson had settled claims; however, no stipulation has yet been received by the Court.

2. The Board is the named party-in-interest representing the University of Rhode Island ("URI").

their intent to have the summary judgment issues discussed at this time, I will examine in this Report and Recommendation the Board's response to Peterson's motion for summary judgment against Pietrafesa. *This discussion comes with the caveat that, until either Peterson or the Board present some case law to the contrary, it is my position that the Court should not formally grant or deny summary judgment on the Board's claims against Peterson, or dismiss Peterson from the suit, until Peterson files a formal motion for summary judgment against the Board.*

Also before the Court is the motion of Pierre Biscaye ("Biscaye") and Columbia University ("Columbia") for summary judgment against the Board as third-party plaintiff. In that motion, Biscaye and Columbia argue that summary judgment is appropriate because Biscaye owed no legal duty to plaintiff. Based on the following analysis, I find there are no material facts in dispute and that Biscaye and Columbia are entitled to judgment as a matter of law.

*Facts*

In February of 1988, Pietrafesa was injured while on board the R/V Endeavor ("the Endeavor"), a vessel owned by the National Science Foundation, chartered to and operated by the University of Rhode Island ("URI"). Pietrafesa and a number of other scientists were taking part in a joint oceanographic research expedition. For this expedition, URI had time chartered the Endeavor to Brookhaven National Laboratory/Associated University, Inc. ("Brookhaven"). The Endeavor was at sea on an oceanographic research cruise, which was one leg of a multi-year, multi-cruise, multi-vessel, multi-institutional program known as SEEP–II.

Pietrafesa was injured by a mechanical crane called a "J-frame" which is a type of scientific casting equipment ("CTD"). The J-frame crushed his hand when it came down on the J-frame's "rest stop." At the time of the injury, the proper number of people were available to help with and were participating in the deployment of the J-frame. Each of the scientists and technicians making the J-frame casts aboard the Endeavor was a seasoned oceanographic researcher with experience using weight handling equipment, including the J-frame.[3]

Pietrafesa was employed by North Carolina State University and was acting as a "principal investigator" aboard the Endeavor. Biscaye was employed by Lamont–Doherty Geological Observatory of Columbia University and acted as a "principal investigator" and also "Chief Scientist" aboard this cruise. The primary responsibilities of the Chief Scientist, as will be discussed later in this Report, relate to the overall scheduling and coordination of the cruise, and acting as liaison between the scientists and the captain.

On this expedition, URI supplied the Endeavor's crew, all of whom were URI employees. John Tate ("Tate") was employed by URI as the Master of the Endeavor. Everett McMunn ("McMunn") served as Chief Mate. David Nelson ("Nelson") served as URI's Marine Technician. John Buss ("Buss") was employed as boatswain.[4]

The Endeavor was built in 1976 by Peterson. Buehrens, who was URI's chief representative with respect to the design, development and construction of the vessel, provided to Peterson all plans and specifications for construction. These plans and designs were created by naval architects for the Woods Hole Oceanographic Institute. Peterson had no involvement in the design, but built the vessel according to the plans submitted by Buehrens and URI.

3. Charles Flagg ("Flagg") was operating the controls of the J-frame at the time of the injury. Flagg was a "principal investigator" from Brookhaven. Flagg was running the station and responsible for the CTD experiments that were being conducted at the time plaintiff suffered his injury.

4. There are other URI employees who did not travel on the February, 1988 expedition, but have provided deposition testimony in this case. John Bash ("Bash") was URI's Marine Superintendent at the time of the accident. Clifford Buehrens ("Buehrens") was the predecessor to Bash as URI's Marine Superintendent. William Hahn ("Hahn") was employed by URI as the Science Officer and the supervisor of URI's Marine Technicians in February of 1988, and is currently URI's Marine Superintendent.

During construction of the vessel, URI directed that the ship be equipped with the J-frame. The J-frame had not been part of the initial design for the vessel, but was added in response to requests by URI scientists that such a crane be installed for their use in conducting experiments while on research voyages. Consequently, Buehrens developed design plans for the crane and retained a naval engineer, R.A. Stearn ("Stearn"), to formulate engineering specifications for the J-frame.

The J-frame consisted of a hydraulically-powered steel boom attached to the main deck on the vessel's starboard side. The base of the boom was hinged to permit the boom to swing outboard over the starboard rail as a cable winch lowered scientific instruments into the ocean. Buehrens directed that the J-frame be supported by two pistons which would bear the weight of the J-frame when fully extended outboard. This support piston design was utilized to avoid the use of a standing "rest stop." [5] Buehrens wanted to avoid use of a "rest stop" design because it created an exposed surface area which would catch the weight of the J-frame boom when the boom came down. He was aware of a previous accident on another vessel where the J-frame boom crushed a scientist's elbow as it came to rest on the "rest stop."

Buehrens' design called for pistons that would be permanently attached to the deck and the J-frame. Stearn created the J-frame's engineering drawings according to Buehrens' directives, and Peterson built the J-frame pursuant to those directives and drawings. As originally constructed, the movement of the J-frame was accomplished by means of a hydraulic piston which was fully extended when the J-frame was in the upright position. As the piston compressed, the J-frame swung outboard. A second piston, which was not hydraulic, served to guide and to bear a portion of the weight of the J-frame. Both the hydraulic and support pistons were affixed to the underside of the J-frame.

URI took possession of the Endeavor in October of 1976, more than eleven years before Pietrafesa's accident. *Once in the possession of URI, the vessel was never returned to Peterson for any reason, and Peterson never again performed any additional work upon the vessel.* After the vessel was delivered to URI, Peterson had no further involvement with the J-frame.

In early 1987, URI decided to alter the J-frame support system by removing the non-hydraulic support piston and installing a rest stop in its place. URI and its port engineer, Ralph Metz (who had replaced Buehrens as marine superintendent in 1984), decided to make the alteration. URI chose to alter the J-frame because members of scientific parties often-times forgot to remove a thirteen-inch steel pin from the J-frame before operation. When the J-frame was operated with the pin in position, the pin would jam and bend, creating a maintenance problem. This would often times result in interruption of the scientific experiments. Installation of the "rest stop" meant that the scientists would not have to use the pin. Another problem with the J-frame was that grease, oil and dirt were getting into the scientist's samples.

The alterations made to the J-frame were designed by URI and Ralph Metz, URI's port engineer. URI retained outside welders to make the alterations according to its plans. Buehrens, who by this time had retired from his position as URI's marine superintendent, happened to be present at the vessel's pier as the welders were making the changes. Buehrens warned Metz that the J-frame's original piston support had been designed to prevent injury and that the addition of a rest stop could be dangerous. In response, Metz told Buehrens to "mind his own business." Despite Buehrens' warnings, URI completed its alterations of the J-frame supports and replaced the support piston with a rest stop.

Peterson played no role in designing or implementing URI's alteration, was never contacted for any input regarding the feasi-

---

**5.** Attached, for ease of reference, are photographs of the Endeavor fitted with twin pistons (Exhibit A) and the Endeavor fitted with a "rest stop" (Exhibit B). [Editor's Note: Photographs omitted from publication because they are not reproducible.]

bility of making the changes, and was never aware of those changes. On February 18, 1988, more than 11 years after Peterson's last involvement with the vessel and J-frame, and on the vessel's *first* voyage after URI altered the J-frame by adding a rest stop, plaintiff placed his left hand on that rest stop and was injured.

Pietrafesa has brought suit against the Board, as representative of URI which is the owner of the vessel, Peterson, the builder of the vessel, and Brookhaven, a research institution involved in the expedition. The Board has filed a cross-claim against Peterson and a third-party claim against Biscaye, who was the Chief Scientist aboard the Endeavor, and Columbia (where Biscaye served as a professor). Peterson has filed cross-claims against the Board and Brookhaven. Peterson has also filed a third-party complaint against Stearn who was the naval engineer who formulated engineering specifications for the J-frame crane.

*Discussion*

Defendant's motion for summary judgment is made pursuant to FRCP 56(c), which states:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers or interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The initial burden in a summary judgment motion requires the moving party to show that no genuine issue exists as to any material fact.[6] The burden then shifts to the nonmoving party to show that there is least one factual issue that is both "genuine" and "material." The factual issue is "genuine" if there is sufficient evidence favoring the nonmoving party on which a jury could reasonably return a verdict for that party.[7] If the evidence is based on conjecture, merely colorable, or is not significantly probative of the fact alleged in the complaint, there is no "genuine" issue, and summary judgment may be granted.[8] The issue of fact is "material" if the dispute necessarily "affect[s] the outcome of the suit."[9] The Court's function is to determine whether or not such a genuine issue exists, and not to resolve such existing factual issues.[10]

If the Court determines that no genuine issue of material fact exists, the Court must then determine whether the movant is entitled to judgment as a matter of law. In making this determination, the Court considers the facts from the record, and makes inferences therefrom in the light most favorable to the nonmoving party.[11]

1. *Peterson's Motion for Summary Judgment*

As discussed in the introduction to this Report, Peterson has not yet filed a formal summary judgment motion with regards to the Board's cross-claims. However, because both Peterson and the Board have briefed the issues, because the Board argues that Peterson will be dismissed from the suit unless the Board's contentions are addressed, and because both parties have manifested their intent to have these issues resolved at this time, a discussion is warranted.

The Board pleads in its cross-claim against Peterson that, if it is found liable to Pietrafe-

6. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

7. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In a summary judgment motion, the Court will not resolve questions of credibility or conflicting inferences. Rather, it will assess the sufficiency of evidence as a matter of law, resolving all factual disputes in favor of the opponent. *Id.*

8. *Id.; First Nat. Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968); *Local No. 48, United Brotherhood of Carpenters and Joiners v. United Brotherhood of Carpenters and Joiners*, 920 F.2d 1047, 1050 (1st Cir.1990).

9. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

10. *Id.* at 249, 106 S.Ct. at 2510.

11. *Anderson*, 477 U.S. at 248, 255, 106 S.Ct. at 2510, 2513. *See Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 485 (1st Cir.1992); *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991).

sa, then Peterson is liable to the Board for contribution and/or indemnification because it "was the active negligence and breach of defendant Peterson's express and implied warranties and willful and wanton conduct which were the sole or contributing cause of plaintiff's injuries and damages." Peterson contends that there is no possibility it could be held liable under applicable law because the Endeavor was not defective when it left Peterson's factory. Any defect in the Endeavor, Peterson claims, resulted from URI's modification of the J-frame in 1987.

Pietrafesa's claims fall under theories of products liability (for negligently designing and constructing the vessel), strict liability (for negligent design, testing, inspection and distribution of the vessel and the J-frame), and breach of the implied warranties of merchantability and fitness for a particular purpose. Causes of action based upon the doctrine of products liability, including strict liability, are governed by the general maritime law.[12] Further, claims based upon warranty theories constitute maritime torts and are also governed by the general maritime law.[13]

This case does not require extended analysis of the law or the facts in order to determine that *no valid claim exists against Peterson.* Pietrafesa (and the Board by way of its cross-claim) must establish that (1) the Endeavor was in some way defective when it left the control of Peterson and that the defect caused the injury alleged, or (2) Peterson in some other way acted unreasonably in its construction of the Endeavor, which re-

sulted in the alleged injury. No party in this case has presented *any* evidence which would indicate that Peterson was at fault in any way. Indeed, all the evidence presented indicates that the cause-in-fact and the proximate cause of plaintiff's injury was URI's own actions.

In applying the general maritime law to products liability causes of action, federal courts have applied Section 402A of Restatement (Second) of Torts, which provides as follows:

> (1) One who sells any product in a defective condition unreasonably dangerous to the users or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.[14]

To recover under this Section, a plaintiff must prove: (1) that the defendant sold or manufactured the product; (2) that the product was in a defective condition at the time of the sale or manufacture; and (3) that the defective condition proximately caused the plaintiff's injury.[15] "Defective" means unreasonably dangerous,[16] and the plaintiff bears the burden of proving that the product was

---

**12.** *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 865, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986). Peterson contends that maritime law controls this action because the alleged tort had its impact while the vessel was on the navigable waters of the United States and because the nature of the alleged wrong bears a significant relationship to traditional maritime activity. *See Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 253–61, 268, 93 S.Ct. 493, 497–501, 504, 34 L.Ed.2d 454 (1972); *Victory Carriers, Inc. v. Law,* 404 U.S. 202, 205–06, 92 S.Ct. 418, 421–22, 30 L.Ed.2d 383 (1971).

**13.** *E.g., Complaint of American Export Lines, Inc.,* 620 F.Supp. 490 (S.D.N.Y.1985); *Best v. Honeywell, Inc.,* 491 F.Supp. 269, 272 (D.C.Conn.1980). The adoption of strict liability

in admiralty has been in substitution for a cause of action based on breach of implied warranty. *Id.* Accordingly, the analysis in this Report will primarily discuss the strict liability law applicable to manufacturers.

**14.** Restatement (Second) of Torts § 402(A) (1965); *See East River Steamship Corp.,* 476 U.S. at 865, 106 S.Ct. at 2299; *Pan–Alaska Fisheries, Inc. v. Marine Constr. & Design Co.,* 565 F.2d 1129, 1135 (9th Cir.1977).

**15.** *See Complaint of American Export Lines,* 620 F.Supp. at 517–18 (discussing these elements in a breach of implied warranty context).

**16.** *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1087–88 (5th Cir.1973).

defective at the time of sale or manufacture.[17]

The Restatement addresses the situation in the instant case. In Comment (g), the drafters wrote:

> The Rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.[18]

Thus, when the plaintiff (or the cross-claimant in this case) can present no evidence which establishes that a defect existed in the product before its modification, the manufacturer is simply not liable.

In the present case, there is no evidence that the vessel or the J-frame were defective or unreasonably dangerous at the time they left the hands of Peterson in 1976. Rather, the plaintiff was injured because he placed his hand on a rest stop which did not exist until URI itself altered the J-frame in 1987. Thus, the hazardous defect which proximately caused the plaintiff's injury did not exist until more than ten years after the vessel and J-frame left the hands of Peterson. No evidence has been presented which supports the contention that the Endeavor was defective in any way, or that Peterson acted unreasonably.[19]

The Board makes three main arguments in opposition to this summary judgment motion.

In the first argument, the Board disputes Peterson's contention that, since Peterson did not design the J-frame or any other part of the vessel, it cannot be held liable.[20] Although Peterson does make this contention in its brief, it is not necessary to the disposition of the case. Thus, assuming that the Board is correct and Peterson *may* be held responsible, the Board must still present some evidence that the Endeavor left the control of Peterson with a defect, and that *that defect* caused the alleged injury.

On the second matter, whether the vessel *was* defective, the Board argues in its brief:

> The assertion by Peterson that the vessel and J-frame, was not defective at the time of delivery to the University in 1976 is also without merit. The J-frame, as constructed and installed by Peterson on the R/V Endeavor in 1976, was done so without any safety guard or device that would prevent anyone using the frame from placing their hand on the bulwark immediately in front of the J-frame or into the notch on top of the bulwark where the J-frame originally came to rest fully extended or otherwise from getting to close to the J-frame while in operation. This absence of any safety guard or shield made the J-frame operation unreasonable (sic) dangerous and therefore defective. *Vickers v. Chiles Drilling Co.*, 822 F.2d 535 (5th Cir.1987).

There are two shortcomings in this argument. First, the above statement is an unsupported argument by counsel that there was a "defect." In opposing a summary judgment motion, the Board must present some *evidence*, such as deposition testimony of an expert or an affidavit that supports the proposition that failure to install this "safety guard" is a *defect* which creates a hazardous situation. Second, and more importantly, there is no evidence presented (or allegation

---

**17.** *Ocean Barge Transp. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121, 124 (3rd Cir.1984).

**18.** *Restatement (Second) of Torts*, § 402A, Comment (g).

**19.** *See In re Complaint of American Export Lines, Inc.*, 620 F.Supp. 490, 519–20 (S.D.N.Y.1985).

**20.** The Board refers to the doctrine of assembler's liability, which establishes liability even if

the manufacturer had no role in the design of the product. *See Baughman v. General Motors Corp.*, 627 F.Supp. 871, 873 (D.S.C.1985). Under this doctrine, a manufacturer/assembler who incorporates a defective component part into his finished product and places the finished product into the stream of commerce is liable in tort to one injured as a result of a defect in the component part.

made) that *this* alleged defect—the lack of a safety guard on the bulwark—was the defect which proximately caused or was in any way involved in the injury. In fact, the Board does not dispute Peterson's allegation that the actual cause of the injury was, not the lack of a safety guard on the bulwark, but rather the presence of a rest stop in replacement of the prior non-hydraulic piston. The defect alleged by the Board, even if it was supported by facts, simply has nothing to do with the injury in this case.

The third argument made by the Board is that liability can somehow be established if "the alteration or modification of the J-frame by the University was reasonably foreseeable" by Peterson. Although it is highly questionable whether there is any basis in law for this argument,[21] there is a much simpler factual reason why it fails. Even if Peterson constructed an inefficient or problematic J-frame, and it was reasonably foreseeable that URI would try to modify it, the undisputed facts reveal that URI modified the J-frame for its own convenience[22] *after being specifically informed the rest stop would create an unsafe, hazardous situation.* This deliberate action is a *prima facie* cause-in-fact and the proximate cause of the injury. URI's failure to present any evidence to the contrary entitles Peterson to summary judgment.

    2. *Biscaye and Columbia University's Motion for Summary Judgment against the Board's Third Party Complaint*

In its third-party complaint, the Board alleges that Biscaye, acting as Chief Scientist aboard the Endeavor, had the duty and responsibility to:

    a.  schedule and make arrangements for the scientific party work assignments;

    b.  ensure that all scientific personnel assigned to perform on-deck scientific/research operations are competent to do so, and/or have received the proper training before handling any equipment or performing such operations;

    c.  ensure that all on-deck scientific/research operations are properly manned and otherwise conducted in a safe manner to avoid injuries to personnel or damage to the ship;

    d.  request assistance where needed for ship personnel beyond the operation of winches, if such assistance is needed.

The Board also argues in its brief:

> The chief scientist has the responsibility for the activities of the science party that's on board and if they were to do things that appeared dangerous they should be prepared for that and trained.

> [T]he chief scientist is responsible to ensure that the members of the science party are competent to perform the tasks they would be doing on board the vessel.

> The chief scientist calls and leads the on board meetings and briefings of the science party; ... outlines and schedules the scientific work to be done; ... including the work schedule for the J-frame.

> [I]t is the role of the chief scientist to set the tone of the voyage regarding the safe and efficient conduct of the science operations and to exercise his authority to change or stop, if necessary, any deployment or other science operation that he deems unsafe or dangerous.

The Board claims that these allegations are supported by the facts presented, and they are sufficient to create a *legal* duty which would support a finding of negligence on the part of Biscaye. The Board alleges Biscaye breached his *legal duty* when he failed to ensure that the on-deck scientific

---

**21.** This argument is faulty as a matter of law because URI, not Peterson, designed the vessel and the J-frame. If it was "reasonably foreseeable" that a modification would be needed, then URI should have made the modification when it first designed the J-frame. URI cannot fault Peterson for constructing the vessel according to URI's plans absent creation of an *unsafe or hazardous situation,* which URI has failed to show.

The Board cites to *Sullivan v. Rowan Co.,* 736 F.Supp. 722 (E.D.La.1990), *appeal dismissed,* 925 F.2d 1460 (5th Cir.1991), which does not address this particular situation.

**22.** It is undisputed that the two reasons for the modification, were (1) to avoid maintenance difficulties and (2) to prevent oil and grease from entering into the scientist's samples.

operation was properly manned and conducted in a safe manner, and when Biscaye failed to ensure that Pietrafesa was properly trained to handle the J-frame. Finally, the Board claims that these breaches were both the cause-in-fact and the proximate cause of Pietrafesa's injury.

■ When determining whether or not a defendant owes a legal duty to anyone, it is important to distinguish between a defendant's wrongful actions or "misfeasance," and a defendant's failure to act, or "nonfeasance." Liability for misfeasance may be caused by the injury of any person to whom harm may reasonably be anticipated as a result of the defendant's conduct. Liability for nonfeasance, however, requires the finding of some relationship between the parties of such character that public policy justifies the imposition of a special duty to act on the defendant.[23] The actions of Biscaye, which the Board alleges are negligent, are comprised solely of Biscaye's *failure to act* and thus a "special relationship" must be established in order to avoid a grant of summary judgment.

■ One of the more common situations where a "special relationship" has been found is between an owner/occupier of land and his guest.[24] A "special relationship" has also been found in the following cases:

[A] carrier has been required to take reasonable affirmative steps to aid a passenger in peril, and an innkeeper to aid his guest. Maritime law has long recognized the duty of a ship to save its seaman who has fallen overboard; and there is now quite a general tendency to extend the same duty to any employer when his employee is injured or endangered in the course of his employment. There is now respectable authority to impose the same duty upon a shopkeeper to his business

visitor, upon a host to his social guest, upon a jailer to his prisoner, and upon a school to its pupil.[25]

The question becomes: does the Board have any evidentiary support for its argument that a "special relationship" existed between Biscaye as Chief Scientist and Pietrafesa, such that Biscaye had a legal duty to ensure the safe operation of the J-frame and to ensure that Pietrafesa and the scientists were properly trained in the J-frame operation? To find an answer to this question, it is first necessary to explore the roles of the "Master" (Tate), the "Marine Technician" (Nelson) and the "Chief Scientist" (Biscaye). The Court should not only look to the customary duties which have been assigned to each position, but also to the common understanding aboard the Endeavor in February of 1988 as to the division of responsibility.

### A. Roles of the Master and Marine Technician

The Endeavor was chartered by URI to Brookhaven. The Charter provides:

1. *Service*—The Contractor [URI] shall furnish its oceanographic research vessel, the R/V Endeavor, and crew, to Brookhaven ... for the purpose of conducting field investigations.... It is understood that although Brookhaven may define the general work to be performed, the operation of the Contractor's ship is solely the responsibility of [URI] performing as an Independent Contractor."

This contractual provision makes no alteration to the traditional duty of the owner and/or operator (i.e. rather than the passengers) to ensure that the ship is safe and operated in a safe manner.[26] Under way, this duty resides in the ship's Master, who is

---

**23.** W. Page Keeton et al., *Prosser and Keeton on the Law of Torts ("Prosser")*, § 56 at 374 (5th ed. 1984).

**24.** *Id.*

**25.** *Id.* at 376–77. Although these cases discuss the duty to rescue rather than the specific duties alleged to exist in this case, the cases are relevant in that they establish a "special relationship" between the parties.

**26.** *See Hubbard v. Faros Fisheries, Inc.*, 626 F.2d 196, 199 (1st Cir.1980) (the owner/operator has an absolute duty to provide a reasonably fit vessel); *Complaint of G & G Shipping Co., Ltd. of Anguilla*, 767 F.Supp. 398, 411 (D.P.R.1991) (the owner/operator has a duty to provide a vessel that is well and safely equipped, properly manned by a competent captain and crew). *Cf. Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630, 79 S.Ct. 406, 409, 3 L.Ed.2d 550 (1959) (duty of care).

the agent and representative of the ship's operator.[27]

The traditional role of the owner/operator and the master to provide a safe ship and appurtenances, and to properly train personnel in use of the J-frame, was also incorporated into URI's own operating and safety manuals. URI's Operating Manual for the Endeavor provides:

> The master, by law, has paramount authority over all persons assigned to or embarked on the ship. *He carries full responsibility for the safety of the vessel and all personnel.* He is vested with authority to take whatever action he deems necessary to preserve and maintain the safety and integrity of the vessels and its personnel.[28] (emphasis added)
>
> . . . .
>
> The procedures to turn on the power unit and properly operate the frames will be provided by the marine technician on board.[29]
>
> . . . .
>
> Ship scheduling at a national level has resulted in a much higher percentage of non-URI investigators using the ENDEAVOR. The [URI] technicians provide ship familiarization, an introduction to the specifics of the shared-use equipment aboard and insight into the day-to-day workings of the ENDEAVOR.[30]

The standards promulgated by the University National Oceanographic Laboratory System ("UNOLS") and applicable to URI in its operation of the R/V Endeavor as a UNOLS member provide:

> The ship's Master is, in both law and tradition, solely and ultimately responsible for the safety and good conduct of the ship and all persons embarked, including the scientific party.
>
> . . . .
>
> Because of these legal responsibilities, the Master is also given full legal authority over all operations and personnel, both on board ship and in foreign port ... In practice, the Chief Scientist informs the Master what he desires, and unless it is unsafe or illegal, it will be carried out.... [31]

The traditional role of the owner/operator and the master to provide for safety on the ship has also been incorporated into the Department of Transportation, Coast Guard Regulations, 46 C.F.R. Ch. I, Subchapter U–Oceanographic Research Vessels.[32] Specifically, those regulations provide that "[t]he master of the vessel shall ensure ... [that] only qualified operators are permitted to operate the weight handling gear [i.e., the J-frame]. The master shall designate the operators." [33] In contrast, these regulations impose no duty relating to general safety on the person denominated "Chief Scientist."

Finally, the traditional role of the owner/operator and the master to provide for safety and safety training on the ship has also been admitted by URI's own employees. Specifically, the Marine Technician has been charged with the role of making sure that the scientists who are working with the J-frame know how to use it properly. The URI Science Officer, Hahn, in discussing the role of URI's Marine Technician for safety training, stated:

> [t]he marine technicians are supposed to be cognizant of the safety concerns on the vessel because of their familiarity with the vessel and their experience at sea. So as a

---

**27.** *Jackson Marine Corp. v. Blue Fox*, 845 F.2d 1307, 1309 (5th Cir.1988); *Massachusetts Lobstermen's Ass'n Inc. v. U.S.*, 554 F.Supp. 740, 742–43 (D.Mass.1982).

**28.** *R/V Endeavor, A Manual for Ship Users ("Endeavor Manual")*, at 21.

**29.** *Endeavor Manual*, at 5.

**30.** *Endeavor Manual*, at 11.

**31.** *UNOLS Research Vessel Safety Standards ("UNOLS Standards")*, § 13.5.

**32.** "The purpose of the regulations in this subchapter is to set forth uniform minimum requirements for oceanographic research vessels designated in accordance with § 3.10–1 of this title and subject to Coast Guard inspection requirements." 46 C.F.R. § 188.01–1.

**33.** 46 C.F.R. 189.35–13(4). These regulations are primarily addressed to "hazards associated with connections to the vessel, dangerous moving parts, extremes in temperature and shock hazards." 46 C.F.R. § 189.35–3.

group, they're supposed to certainly contribute to safe operations of the vessel at sea to the best of their ability....[34]

Nelson, the URI shipboard Marine Technician, testified in his deposition that it was his role to determine the amount of safety instruction to be provided, depending upon the level of experience of the scientists on board.[35] If Nelson found that the group was inexperienced, he would demonstrate the operation of the J-frame to the scientists.[36] Nelson testified that although he had no specific recollection of giving safety instructions on the usage of the J-frame on this particular cruise, it is something that was "done typically." [37] Nelson also testified that the group on board the Endeavor when the injury occurred was "experienced" in his judgment. Finally, Tate, the Master of the Endeavor, testified that he and the Chief Mate would probably be the only ones with authority to request that additional personnel assist in the J-frame operation when the weather was rough.[38]

### B. Role of the Chief Scientist

The URI Endeavor Manual designates Chief Scientist's primary responsibility as coordination of the *scientific* mission:

The scientific leader is responsible for the scientific mission of the cruise. It is his responsibility to see that equitable arrangements are made for scientific party work assignments. He is also responsible for the conduct of this party and for the cleanliness and safety of those spaces assigned to his party. Although each scientist may organize his party as he pleases, his organization plan must include arrangements for manning his research operation. If assistance is needed for ship personnel beyond the operation of winches, the chief scientist should make arrangements through the Science Officer well in advance.[39]

Similarly, the UNOLS Standards provide:

One member of the scientific party shall be designated Chief Scientist.... The Chief Scientist is responsible for the coordination and execution of the entire scientific mission, not just his own portion of it. By custom, the personal and professional conduct of the scientific party on board ship and ashore is the responsibility of the Chief Scientist, under the overall control of the ship's Master.

In matters of safety, the Chief Scientist must always defer to the Master in case of dispute. In many cases, safety matters are common knowledge, and not unique to research vessels. In other cases there may be safety hazards unique to the research which the ship's crew may not be aware of. In such instances, the Chief Scientist has a special responsibility to assure safety, and consult with the Master as necessary.[40]

As discussed by Biscaye in his brief, the consistent testimony given by the deponents, including Pietrafesa and URI's own representatives, establishes that the primary duty of Biscaye as "Chief Scientist" was overall scheduling and coordination, most of it prior to the actual cruise itself.[41] According to Clifford Buehrens, who was Bash's predecessor as URI's Marine Superintendent,

Well, I think that the chief scientist's role is one where it is science overall. In other words, his interest is getting his science done, primarily. And I have often warned captains that they're responsible for the safety of the people and that they should

---

34. *Hahn Dep.* at 19.

35. *Nelson Deposition* at 5, 18, 63. [ok]

36. *Id.* at 21.

37. *Id.* at 20.

38. *Tate Dep.* at 17–18.

39. *Endeavor Manual,* at 21. In contrast, the Manual provides that the Master "carries full responsibility for the safety of the vessel and all

personnel. He is vested with authority to take whatever action he deems necessary to preserve and maintain the safety and integrity of the vessels and its personnel."

40. UNOLS Standards § 13.6. In this case, there is no allegation that there are "safety hazards unique to the research which the ship's crew may not be aware of."

41. *See Bash Dep. Vol. 2,* at 32; *Pietrafesa Dep. Vol. 1,* at 19, 183–84. *Pietrafesa Dep. Vol. 2,* at 39.

look out for some of these people who sometimes didn't know enough to look out for themselves.[42]

As plaintiff testified,

Pierre Biscaye can't be [awake] 24 hours. Secondly, chief scientist tries to expedite, facilitate. The chief scientist cannot be familiar with every piece of equipment nor I can't believe the chief scientist is also familiar with all the ship's equipment. See, the chief scientist is there to help facilitate and make sure the logistics are what they should be.[43]

It is uncontradicted that each principal investigator, rather than the Chief Scientist, was responsible for the primary staffing, operation and methodology of his own research and experiments, subject only to the safety considerations of the Master. If a principal investigator needed help, and someone did not have anything to do "he would be told to come and give me a hand. It was just a lot of cooperation among the scientists, everybody helping on another."[44] In terms of general scheduling and coordination of personnel, the Chief Scientist's role was "to make sure there are enough people so that [the scientists] can collectively help each other."[45] As it was summed up by plaintiff: "[T]he chief scientist is really a logistics person to make sure that things run efficiently...."[46]

To summarize, Biscaye has conclusively demonstrated that it was the role of the Master and the Marine Technician to provide for safe operation of the Endeavor. The Chief Scientist's primary role, Biscaye has demonstrated, was to coordinate the scheduling and the logistics of the scientific experi-

ments. To avoid summary judgment, the Board must now provide some basis for the recognition of a "legal duty." What is required are *facts* which establish or even imply that Biscaye was *charged* with a duty to provide for safety on board the Endeavor. The Court must look for a "special relationship" imposed by law, regulation, contract, custom or policy. Mere opinions of witnesses on what should have been done, voiced in retrospect, are not relevant.

In its brief, the Board points to a number of assertions made by various URI employees and scientists which, it argues, support their position. Only two of these factual assertions merit discussion. First, the Board points to the deposition testimony of John Bash, who was URI's Marine Superintendent at the time of the accident. I have reviewed the cited deposition testimony,[47] and have determined that it contains nothing but the unsupported opinion of Bash. Bash simply thinks it was the Chief Scientist's responsibility to make sure that the scientists are competent to operate the J-frame.[48] Bash hints at a *fact* which might create a legal duty when he says "[Biscaye] was provided a copy of the ship's operation manual"[49] and the UNOLS safety standards. But Bash does not go on to explain how the Endeavor Manual and the UNOLS standards created the specific legal duty he alleges: *i.e.*, the Chief Scientist must ensure that scientists working on the J-frame were properly trained on the J-frame operation.[50] Nor does the Board expand on this argument in its brief.

■ But even assuming, *arguendo*, there was a legal duty on the part of Biscaye to

---

**42.** *Buehrens Dep.*, at 38–39.

**43.** *Pietrafesa Dep., Vol. 2*, at 39–40.

**44.** *See Terrence Hammar Deposition*, at 48–49. Nobody told Pietrafesa to undertake the specific tasks, he "just assumed it," in a spirit of cooperation. *Pietrafesa, Vol. 1*, at 74.

**45.** *Pietrafesa, Vol. 1*, at 183–84. *See also, Nelson Dep.* at 41, 50.

**46.** *Pietrafesa Dep., Vol. 2*, at 29.

**47.** *Bash Dep. Vol. 2* at 32, 41–43.

**48.** *See Bash Dep. Vol. 2*, at 41–43.

**49.** *Bash Dep. Vol. 2*, at 42.

**50.** *See* above cited portions of the Endeavor Manual and the UNOLS Standards. One portion of the testimony which seems to capture the tentative tone of Bash's response provides:

Q. In your mind, did he have a duty to ensure that the scientific research personnel had received proper training before handling any equipment on board?
A. I think he should have been concerned about it.
*Bash Dep. Vol. 2*, at 43.

ensure that scientists working on the J-frame were properly trained, *there are no facts to support the allegation that Pietrafesa or the other scientists operating the J-frame were improperly trained. To the contrary, all of the evidence presented indicates that Pietrafesa and the other scientists were experienced and well-trained in the J-frame's operation.*

The only other factual matter which merits discussion is the affidavit of Margaret Leinen ("Leinen").[51] Leinen claims to have participated in approximately twenty to twenty five oceanographic research cruises serving as a principal investigator on most, and serving as Chief Scientist on at least six of these cruises. Leinen claims that "[i]t is ... the role of the chief scientist to set the tone of the voyage regarding the safe and efficient conduct of all science operations." Leinen also states:

> It is the responsibility of the chief scientist to ensure that the collection of samples and the on deck operations performed by the science party are conducted in an appropriate manner. I try to carry out this responsibility in various ways. For example, I will work with the Captain at the beginning of the cruise to discuss the operations to be carried out with the other scientists. I will also observe the various tasks being conducted by the science party and have on more than one occasion exercised my authority as chief scientist and stopped an operation to suggest or make changes in the way it was being conducted. On at least one (1) occasion, I informed the principle investigator that his group would not be allowed to deploy any other instruments over the side unless they changed their deployment procedures and the changes were, in fact, made.

This passage is nothing more than personal opinion and anecdote. Simply because she believed it to be proper to exercise her authority, in that particular situation, does not establish that the Chief Scientist was charged with a legal duty or obligation. Besides failing to present factual support, Leinen does not even proffer the conclusion which the Board wishes to reach—that the Chief Scientist was *charged* with the duty to provide for safety.

Besides the factual assertions which the Board claims establish a legal duty on the part of Biscaye, the Board argues that negligence on the part of the Marine Technician may be *imputed* to Biscaye on a *respondeat superior* basis. The Board argues that the URI Marine Technician (Nelson) had a legal duty to provide training and/or provide for the safe operation of the J-frame, that he allegedly failed to do so, and that his actions or omissions may be imputed to Biscaye. The Board alleges that the Marine Technician was paid with funds from the research grant [i.e. from Brookhaven], that he was treated as a member of the science team, and that he "was under the direct and absolute control of Pierre Biscaye, not the ship's master." On this basis, URI argues the Marine Technician was employed by Biscaye, and Biscaye should be held liable as an employer of the Marine Technician.

There is no basis in law or fact to hold Biscaye liable for any person's actions or omissions except his own. The undisputed facts reveal that URI *requires* a Marine Technician, *a full-time employee of URI*, to be on board a research expedition, and that he be paid out of funds from the research grant as are other members of the vessel's crew. Although Biscaye may have had some control over the Marine Technician on board the Endeavor, the Technician was first and foremost an employee of URI, acting on behalf of the URI Science Officer, charged with fulfilling independent duties on behalf of URI relating to safety, such as the safe operation of the J-frame.[52] Biscaye was not separately charged with these duties relating to the safe operation of the J-frame—his duties were limited to coordination and scheduling of the

---

51. Leinen is presently employed by URI as the Vice Provost for Marine Affairs and Dean of the Graduate School of Oceanography. She was formerly employed by URI as an Associate Dean and as a research scientist in geological oceanography.

52. *See Bash Dep. Vol. 2* at 36; *McMunn Dep.* at 21; *Hahn Dep.,* at 43. *Biscaye Dep.,* at 48.

scientific operations. Thus, any duties, or breach of those duties, which the URI Marine Technician may have had cannot be imputed to the Chief Scientist, even though the Chief Scientist did have some managerial authority over the Marine Technician.

*Conclusion*

Based on the foregoing discussion, Peterson's motion for summary judgment against Pietrafesa should be granted. The Court should withhold consideration of summary judgment on the Board's cross-claims against Peterson until Peterson files a summary judgment motion. Finally, Biscaye's and Columbia's motion for summary judgment against the Board should be granted.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt.[53] Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court.[54]

January 24, 1994

**53.** Rule 32, Local Rules of Court; Fed.R.Civ.P. 72(b).

**54.** *United States v. Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980).